You can only do what you can do. The next case on the calendar is 24-43. Is it Kohler or Collar?   Thank you. Versus Monsanto. And I think you're splitting time. Are you splitting time? I am not. My colleagues are.  Oh, I'm sorry. Yes, there's only one of you. Okay, so gentlemen, what we'll do is Madam Clerk will put the, how many minutes are each of you taking? Five and 15? Yeah, I'll take 15. Mr. Jones will take five. Okay, so Madam Clerk's going to try to make that easier for you by restarting the clocks, but watch that countdown, okay? Thank you, Your Honor. All right. Go right ahead, please. Good morning, and may it please the Court. David Wolfe for Plaintiff Appellants, and I'd like to reserve six minutes of my time for rebuttal, if that works. Sure. In this case, the District Court erred when it made a factual finding based on a partial version of the study that the Monsanto and Baer defendants misrepresented to be the entirety of the study. Those same defendants now concede that the document at the center of the District Court's factual determination was incomplete. On that basis alone, reversal. Was it just incomplete because the appendices were detached? That is correct, Your Honor. Okay. And the appendices, importantly, affirmatively proved Plaintiff's version of the facts and disproved the District Court's determination. So when was that pointed out to the District Court? It was pointed out to the District Court in our opposition to the motion for judicial notice, and we've raised this point, and importantly, the portions of the appendices were cited in our brief as supporting our allegations. Which brief? Sorry. The portions of the appendices were cited in our complaint. Right. Exactly. So that's part of the problem. The complaint incorporates, and she thought incorporated by reference, the report, but apparently imported appendices. Or is your position that the appendices were incorporated? The entire study was incorporated, and the appendices are plainly part of the study. Okay. So I think we're saying the same thing. The District Court thought that the report was incorporated, right, into the complaint. Correct. And then opposing counsel, your position is opposing counsel filed and requested judicial notice in its opposition of a version of the report that was not complete. Correct. Okay. And represented that to be the complete version of the study. Okay. And so you pointed out to the District Court that that was not a complete report in your opposition? That's correct. Okay. Thank you.  And apart from that, the District Court never could have resolved the issue through other allegations, because plaintiffs alleged that the study author had independently testified that the study samples at issue were exposed to nitrites for a matter of minutes, not days, which is what the District Court's opinion is. In the text of, in the body of the report? No, no, no. In separate allegations based on its trial testimony, we alleged this in the complaint. I'm not sure that the two versions are as separate as the parties make it appear. I mean, as I struggled through with my fairly limited scientific laboratory background, the exposure meant kind of the pipes are open, the stuff is pumped in, and then the six minutes stops, but the stuff stays there. And so the exposure continues. And then over time, there's a reduction, a diminution as it scatters, dissolves, who knows what. I don't certainly know. So, it's not like the exposure was simply six minutes and then it was removed. Well, Judge Clifton, I think that Your Honor hit the nail on the head, because the allegations pertaining to the products that plaintiffs use would be exposed when they're open. And then the same type of passive exposure that Your Honor just described would occur once they're closed. And just as a matter of chemistry, we allege that this reaction is a very quick reaction. And so if Your Honors look at FER 91, you will see that the study authors measured the level of nitrites after the minutes of exposure. And you can see that between 15 minutes and an hour after exposure, there were virtually no nitrites left in the study samples. And so the better and more scientific way of measuring exposure for this type of a case is through active exposure, because it's such a quick reaction that the days after the active exposure isn't that relevant. Well, how does the exposure concentration compare with the conditions that you allege would be focused on the product in the real world? Exactly. So our allegations are based on the sworn testimony of the guy that designed the study who's a PhD chemist. And he testified under oath, and we allege this, that tests six and nine were designed to most closely approximate warehouse conditions. And we allege that warehouse conditions are actually safer for the formation of NNG, which is the chemical at issue in this case, than, for example, a consumer's garage. Because a warehouse is bigger space, propane forklifts burn much cleaner than gas-powered combustion engines. That's why you don't have cars driving in a warehouse. Does your complaint include those allegations? It does. And it also includes allegations that weed whackers and things like that burn even dirtier than consumers' cars. Can I back up? Because you answered an earlier question, and I think we maybe miscommunicated when we were talking about what is or is not incorporated into the complaint. And you talked about the statements I have here in my notes that are attributed to the author of the study.  And I thought those were in the body of the report. I think the allegations are in the complaint. What I'm reading in the complaint, are those actually from a deposition? It's actually his trial testimony. He said this on the witness stand before a jury. I'm not sure it matters a whole lot, but the allegations in the complaint were not stricken, and they're not from the body of the report. Right. The ones pertaining to his testimony, obviously, the study is his. Counsel, can I ask you a foundational question? Of course. Are there any allegations that the plaintiff's products were tested for whether they exceeded one part per million of, what is it, NNG? No, there are not. But while that would be one way to prove our claims, certainly the rules don't limit our proof to only that way. And we have a comprehensive study, but I want to point the court to some of the other evidence because I think it's important. Before you do that, can I ask you about a question embedded in Judge Tallman's question? There is a concern, I think the district court had a concern, that you never really came forward and showed where this one part per million standard came from and why it was  Yes. And I'm reading, and I don't want to take you through it because it takes a lot of time, Paragraphs 303 through Paragraphs 309 seem to be where that comes from in your complaint. Is that fair? If those are the paragraphs that pertain to the EPA's policy that was first implemented in 1980, but that is not the only source because we allege, and this is based on the sworn testimony of at least two senior employees who were the principal liaisons with EPA and Monsanto's own corporate representative, that they later agreed in approximately 2000 to a one part per million certified limit. I'm familiar with those allegations. And your concern, in fact, I think it's in the complaint, in several different paragraphs of the complaint. And that's what you're relying on? Both of those sources, yes. Okay, thank you. I interrupted you. I don't want to... No, no, no. Judge Tallman, back to your question. So no, we didn't include those allegations, but I think we can get there even without the study. Allegations about the testing? About the... Right. Testing plaintiff's products. That was the question. So your position is that you can show it through the experimentation that was done? I think we could show it even without the experimentation. And let me just explain really quickly. We explain the chemical reaction. We point to particularly... You mean the complaint explains the chemical reaction? Yes, the complaint does. Okay, all right. The production lots that Monsanto found that were out of specification in the year 2000, and that's important because the certified limits apply not at the time of sale or use, but from the date of production. And this wasn't a one-off manufacturing defect where something fell in a well or something like that. This was investigated, we allege this, and the two sources of the contamination were either ambient city air or nitrites from the propane-powered forklifts, which again, we allege burn much cleaner than cars. And so those two conditions exist in the real world. And so I think we get there without that. And I'll also point the court to the safety data sheets that both defendants either had or circulated. And importantly there, the defendants put a two-year limit on the products under the section for safe storage. So internally, they're saying that you can store this safely for two years. And obviously for the consumers, they're saying that these are products that last for an Now, I would like to turn quickly to plaintiff's allegations that these products were unregistered because that's kind of the core legal issue in the complaint. So FIFRA is a statute that provides defendants like Monsanto and Scotts with a license to sell and distribute products. And the three pillars, if you will, of the product registration are the product's labeling, its packaging, and its composition. Now, in Sultan Chemist, the Third Circuit found products to be unregistered where the defendants in that case deviated from the product's packaging. Here, we think it's much more serious because it goes directly to the product's composition. Now, under 136 AC5C, EPA must make a finding that the composition of the product is not going to adversely impact human health or the environment before it is allowed to register the product. In fact, EPA does not have congressional authority to register a product absent that determination. And here, EPA determined not just that the product – sorry – EPA determined that these products could never exceed one part per million for NNG at any point during their life cycle. That is the license that they gave the defendants to sell and distribute the products. And plaintiff's core claim is that the products that they bought did not comply with that they were unregistered. And that makes sense because EPA had never made a safety determination based on an understanding that the products could ever exceed one part per million. And that safety determination is necessarily a prerequisite for registration. If I can summarize your position, your position is that if the product exceeds one part per million, it becomes misbranded at that point and must be re-registered with EPA at the higher level. No, Your Honor. It's not when it exceeds it. It's – in this case – At the point of purchase. It's at the point, right. But is that because it's – is that because you're saying it's inevitable when you open up it's going to exceed? So that has to be – Well, under EPA's regulations, it's just whether it can or not. But we think it's inevitable and we point – and we would point the court to the study where – I get this confusion. I think it said – with Judge Chalmers – I think it said two different ways, a little bit differently in your briefing. So could you just back up and make this very clear? Yes. Okay. So the license – Say repeatedly and you italicize the word can. It can reach this limit. But I think what you're saying is – because you're also very clear – you're concerned at point of purchase there's a foul on the field, right? Yes. Yes. And that's because it's not labeled to say that it's going to or just that it can Well, it's both. We think that it – I've never purchased a product that says this can become dangerous. Well, I think I would liken it to something that says use within 10 days after opening or something like that. Well, in answer to Judge Chalmers' question, is that your contention that that's what's missing here? Well, we think that first the unregistered pesticide theory is that the products simply violated the license that they were granted. But that's still premised on the notion that it will get over one part per million. That it can get over one part per million. Well, see, that's – we have the same problem. I feel like I'm going to do Yoda. Don't try, do. It's not can. It's will. And I'm not sure that there's a violation if, in fact, the product doesn't get over one PPM. No, I would concede that if the product – if the products as sold can never get over one part per million, then we would concede that – But I don't know why you're splitting this hair, because I think what you've spent several pages arguing is that it's inevitable that they will. Right. So I don't know why you're taking this fallback position, and that makes my antenna start to twitch about that I'm missing something here, and it doesn't make sense to me. Well, my mistake – and, Your Honor, we've certainly alleged that they invariably will. We think we show substantial certainty that they will. And because of that, they were always unregistered at the point of sale, specifically because the license that the defendants were granted was for the sale of a product that did not expire, and what they sold was one that does expire. And this makes sense in light of FIFRA's statutory scheme, because if EPA is making a safety determination based on a chemical composition that consumers aren't actually using, then they aren't actually making a – It may have been part of the district court's problem as well, counsel, but I think you are – and now you've clarified – you're alleging that this product at the time of sale is a product that inevitably – if you open it, right, if you open this product, it's going to be – reach the over one part per million threshold. I think that's what you're talking about. Yes. So it is peculiar that – so I looked hard in the complaint, because I think the district court thought you hadn't alleged that, that you weren't going to expose – I don't think – I think the district court thought that the complaint didn't allege that the product was going to be used in a way that it would reach that threshold. But I think your complaint in the paragraphs we just identified does, if one looks at these appendices. We – exactly. We actually compare the minutes that a consumer would have the product open compared to the study and show that during normal use, the minutes that the product is going to be exposed by the consumer vastly exceeds the exposure times in the study by several orders of magnitude. Okay. We've all three interrupted you on the very same point of confusion, but did you want to say anything else about your registration claim? Not at this time. I'll save it for rebuttal, unless there are other questions.  Not about registration. Okay. Thank you. I think I interrupted you. I'm sorry. May it please the Court, John Rosenthal for Monsanto. When you look at what the district court did, the district court dug into this 152-page complaint, 27 voluminous exhibits, three-hour hearing, and the district court got this right. Right? What this is is a house of cards because we have this constant moving, well, we think we can prove. Well, we think we can prove. We think the statute says this. We think the CFR says this, but it doesn't say any of that. Right? So let's look at the first thing, which is, have they alleged a safety defect here, an unreasonable safety risk? Right? And their only evidence here is the 2004 study. Right? Well, that's not their only evidence. Well, their only evidence would be the 2004 study, as well as what they say is the testimony of one of our people. Correct. Their complaint also alleges that Monsanto witnesses made certain concessions. But when you look at the Monsanto witnesses, they're talking about nitrosamines, not NNG. Right? And when you look at the 2004 study, this is not a study about products that were purchased. This is not a study about products that were sold. Right? There were exceedances identified during a manufacturing process, and the purpose of the study was to try and make the product exceed the one part per million, so they could study how that occurred. It was not a commercially product that the plaintiffs bought. It was not in commercial packaging. Right? And when you look at the study, the study doesn't represent what counsel says it does. What do you think we should take from the study? Well, I think what you should take from the study are the conclusions of the study. Well, first of all, the district court looked at the issues they raised in terms of the appendices, and it focused on the actual language of the study. The appendices are consistent. So the court considered the issue that they now raised and rejected it. I think what you should take from the study is that there can be out-of-spec processes during the manufacturing process, but that doesn't inform whether they're out-of-spec or the product can or is likely to go out-of-spec. When you use the phrase out-of-spec, do you mean over one part per million? Over one part per million. And I'll get to the one part per million. So the question is, what evidence do they have that the product goes above a one part per million once it's at the time of sale or once it's sold to the customer? And they have no evidence of that. I think that's what the district court thought, but his contention is that at the time of sale, it's a product that is capable of doing that, and in fact that it will do that once it's opened. What is your response to that? My response is they don't have any evidence of that. It's not a plausible theory. We're just looking at the allegations. So it's not that they don't have the allegations. It's that the allegations are not plausible? The allegations are not plausible, Your Honor. This product has been registered since 1978, right? They're not able to point to a single incidence since this product has been in the marketplace where it has gone out of, above the one part per million threshold. So the examples they point to are examples that you're saying are not, that were not commercially marketed units? They are not. Is that a yes? Yes, yes. Okay, okay. And while they say they have a comprehensive study, this is the first we've heard of a comprehensive study. In fact, during the three-hour hearing, the district court asked plaintiffs, did you test your product? Do you have any evidence of your product going out of spec? And the answer was, unequivocally, we have not tested it.  All right? So what we have here is speculation and conjecture. But their entire case is premised on, this is an unreasonable safety risk. Right? And as this court has said before, when you say you have an unreasonable safety risk, it has to be based upon something more than conjecture and speculation. Right? You need something more here. You look at Williams, Birdsong, Wilson, Gutierrez, all say there has to be something more. And they have not pled something more here. Now, let's get to this, what I call house of cards, with respect to what the regulations provide in terms of this idea that the product is not registered or that it's required to have expiration dates and it doesn't. Right? Those are questions of law. The district court looked at those and rejected them. Well, factually, they all come back to the question that we've been, started with, been Ultimately said that the amended complaint pushed across the line to plausible with regard to whether the material is carcinogenic at some level of concentration. And then said, or expressed concern, doubt, and concluded it was not plausible that the level of concern was established at 1 ppm. Above that, it's dangerous. And then, and I think this is the biggest part, concluded that the complaint had not alleged enough to establish that it was plausible that the products purchased by the plaintiffs and the class members, the proposed class members, would in fact reach above 1 ppm. And it seems to me all the regulatory arguments rise or fall on that last piece. Because if they don't, if the products don't go out of that bound, then the registration arguments have gone away. So my focus, at least for me, is on I guess the last two pieces, and the last one may be the biggest, which is the plausibility of a claim that the products will go above 1 ppm. You've argued that they have no real world examples of the consumer products, and I think that's acknowledged. So the question becomes, is the claim that the chemical process, which is defined, and the episodes reflected in the 2004 study and in the events in the warehouse and so forth that prompted the closer examination by your client, is that enough? Tell me why it isn't. Well, it's not enough because it has nothing to do with actually the products they bought, the products that are packaged, and the products that go to the marketplace. But Your Honor... Well, what's the... I mean, the chemical process doesn't seem to be disputed. Why is it we could be confident, or why is it implausible that the products purchased by plaintiffs might not suffer from the same reaction that caused Monsanto to look at it more carefully? Commendably, I mean, it's important from the study, but I didn't see anything that drew a black line between what the study was looking at and what the episodes in the warehouse referred to and the products ultimately sold to consumers. What's the difference? Well, there's lots of differences. First of all, the product at issue is a crystalline product. A lot of the other products are liquid products. They're very different. I think importantly, Your Honor, if you look at the conclusions of the study, the conclusions of the study actually show the various things that the company does in terms of testing, monitoring, packaging, making certain other additives to the formulation. That all precludes the formation of the NNG above the one part per million. But, Your Honor, I don't want to discount, and why it's very important about what they're saying about these thresholds is very important. The one part per million threshold is not a threshold. They've alleged a safety risk, right? The one part per million threshold is a threshold that the EPA put forward in a draft policy, draft. They say policy, but draft policy, right? And they made it clear in the draft policy that was not a threshold of danger. It was a threshold at which the manufacturer, they were suggesting, would have to submit more information to figure out whether the one part per million above that presented a danger, right? That policy was never actually adopted. In fact, years later, the EPA said, no, we're not going to have any threshold, all right? So then you look at the certification. They say we have to have a one part per million on the product. That's not what the CFR says. The CFR says that's required for technical, right? But it's not for an active ingredient, but it's not required for the formulated product. None of the confidential statements of formula, save one at issue here, have any threshold on there in terms of one part per million. It doesn't exist, right? It doesn't exist within regulations, but they have alleged in their complaint, and that's what we're looking at at this point, that even your client's corp representative testified that they weren't aware of any regulatory body that allows a level above one part per million. Why isn't that enough to make the allegation at least plausible? Well, Your Honor, the EPA, which is the relevant regulatory authority, does not have a threshold requirement. That doesn't really answer the question, though. That's not what he's relying on. There is no evidence that one part per million of energy above that creates a safety risk. But if your company recognizes that nobody affirmatively allows above one part per million, again, at this stage we're just looking at plausibility. Presumably there's a reason. Now, the district court suggested that it may have to do with technology at the time and the ability to measure. But if it's the case that nobody says it's okay to be above one part per million, why is it implausible to allege that there's enough concern to look at more carefully? I mean, if this case went to trial, I'm not saying it will, but if it went to trial, both sides would presumably have a lot more to speak to with regard to both the level of risk above one BPM and the process whether or not the product will actually get above one part per million. But at this stage, why is it implausible? It's implausible, Your Honor, because that is a measure of detection. It's not a measure that that presents a risk at that level. Even the EPA in the draft policy said that that is not a measure of risk. And the things that they're talking about are regulations outside the United States. The EPA has never mandated and does not mandate a one part per million threshold for NNG and has never determined that NNG at one part per million, in fact, at any level, creates a risk of cancer. But that doesn't really answer my question. The fact that they haven't said they've concluded that it creates that risk doesn't mean it's implausible that it does, and the fact that nobody elsewhere has said that not a problem of one part per million. Right, but it's their complaint. They have to come forward with plausible. What is their plausible proof that it presents a safety risk? But nobody lets it go above one part per million. That's their allegation. Well, Your Honor, they're looking at international regulations, which is not what's binding here. They're also looking at Monsanto's representatives. I mean, that's quoted in the first amendment complaint, what I just read. I guess what I'm saying is they've pledged an unreasonable safety risk, right? And the question is, at one part per million, does it present an unreasonable safety risk? Monsanto's never said it creates an unreasonable safety risk. No international agency has said it creates an unreasonable safety risk. But nobody's said that it doesn't. And the fact that the level is identified is itself a source of at least a question mark. Is that a gray area that needs to be looked at more carefully? No, Your Honor, I don't, because this is their complaint. They're coming forward here. Look, what they've tried to do is the litigation around that's been going on since 2015, right? They had a series of setbacks. All of a sudden, we have a new theory. The new theory is it's impurities, right? So that's great for their theory. It has to be a plausible theory. They can't just say one part per million, we're going to pick it out of the air, or even if some other regulators said it's a measure at one part per million, that it causes cancer or presents a safety risk at that point. There simply is just no scientific evidence that they come forward, no evidence whatsoever, a plausibility, that the one part per million threshold is a safety risk for cancer. They simply just, it's not plausible. If they had it, they would put it in there. The district court said, where is it? Not once, but twice, right? And then they have no evidence that their product that they purchased or that anybody purchases has exceeded that level. I see I'm out of time, Your Honor. Not quite. Do you want to wrap up? Your Honor, the district court did exactly what you want a district court to judge here. They looked at an extensive record. This is not the usual case. It's a 152-page complaint. It's a lot of work. There's been years and years of discovery. If they had evidence suggesting that the one part per million presented a real safety risk or that the product is likely to exceed, they would have attached it to this complaint. They didn't. They're asking you to do something the EPA has never done. All right. Now you're over time. Thank you. Thank you for your advocacy, and we'll hear from your colleague. May it please the Court. Jeff Jones on behalf of SCOTS. Your Honor, for all practical purposes, I submit the plaintiffs have largely abandoned their claims against SCOTS. We cited 75 cases in support of our position on the SCOTS argument. They just referenced four, and two of those four came out against the plaintiffs. Their position as to SCOTS is almost wholly unsupported, and it's very important that the SCOTS claims be adjudicated separately, we submit, because it raises very important questions for the thousands of companies that assist in the supply chain or that assist with advertising or the sale or transportation of goods. Plaintiffs' expansive theory could be applied to almost everyone in the country. We are not a registrant. There is nothing in this record attaching us to one part per million. There's no emails. There's no websites. There's nothing that attaches us to this discussion. This one part per million is a discussion for the registrant. And, Your Honor, their theory at bottom is, we agree you distributed a product that was approved and registered by the EPA and California with an approved and registered label. But, SCOTS, you're liable anyway because it didn't have an expiration date on it. That could be applied to truck drivers that are moving this as long as they had some allegation that they read something in the news. We could hear you fine if you could modulate. I'm sorry. I apologize. And I have hearing aids, so I was hearing you. I apologize. My wife says the same thing. But it could be applied to nearly everyone if you just said, well, they read a newspaper article about this harm or there's some speculative notion of knowledge. And, Your Honor, California law prohibits it. It has to be knowledge of the misconduct, personal participation in it, and unbridled control. At bottom, Your Honor, we cannot even do what they alleged. If you look at paragraph 15, it says, SCOTS didn't put an expiration date on the label. And you see that throughout this case, throughout the case, that's what it comes down to. We're not allowed to. We can't change the label. The contract precludes it. Federal law precludes it. California law precludes it. We can't even say anything different than the label. We can't say it in advertising. We can't say it in our written materials. We understand. So we are prohibited from actually doing what they allege that we somehow failed to do. They argue that we can be directly liable, but they cited two statutes that say the sale of an unregistered product is unlawful. That doesn't apply to us. We didn't actually sell anything because we didn't take title to the product at issue. We just helped with marketing and distribution for a product that was approved and registered. So we lawfully sold a registered product. Let me just check to my colleagues. Do you have any questions for counsel? I don't think we have any questions. Thank you, Your Honor. Thank you. Apologies for the volume. Oh, no, no, you're fine. That's all right. You're not alone today. I don't know. It is. Your Honor, I would like to start with this argument that we heard from both sets of defendants that because there was a registration that was obtained, they necessarily sold a registered product. Now, the problem with this argument is it is completely foreclosed by the black and white unambiguous text of FIFRA at 136 AF2. And that section says in plain terms, registration is not a defense to the commission of any offense under this chapter, which includes selling an unregistered pesticide. Well, what about the Floodgates argument? What's your response to that? Because I am concerned about that given the broad nature of your allegation. I guess I'm not sure I understand the Floodgates argument. Well, that every single entity that has a finger in the chain of distribution under your theory is now potentially liable for the fact that Monsanto failed to properly label its product. Well, respectfully, Judge Tolman, that's a question for Congress because in FIFRA. It's a question for us, too, depending on how we write the opinion. Fair enough. But FIFRA makes the sale and distribution of a pesticide an offense. And so this is something where Congress chose to write the law one way. And Scott's unbridled control and its participation in this conduct. Wait a minute. What's their unbridled control and participation in this conduct? What do you have packed in there? For distributing unregistered pesticides and misbranded pesticides. And specifically with respect to Scott. Well, his opposing counsel argues that theory would apply to a truck driver, every truck driver who's got the box in the back. Judge Tolman's point is troubling me. So I understand. But Scott's is more than a truck driver. And we allege that. And this is something that. Well, I think that to be candid, I'm not sure where the court should draw the line. But I know that EPA routinely enforces this against entities that have far less control than Scott's does. What's your control facts? So Scott's was aware vis-a-vis the safety data sheets that the products could expire and that that expiration was linked to safety. They knew that the products as sold did not have an expiration date. And nonetheless, they chose to sell them. And if I can, I'd really like to turn quickly to this question of whether or not the 1980 policy was adopted. Because I think that it was. And I'll point the court to 70 Federal Register 67906, which is from 2005. And there, in a final rule, which we contend has the force of law under United States v. Meade and Hardiman, EPA expressly says this is our policy and applies it there. Now, the other question or the other argument that we heard from Monsanto was that there's not a certified limit. And they point to the confidential statements of formula to make this point. Now, again, plaintiff's theory is that under 158.350A4, this is a limit that EPA set on a case-by-case basis. And Monsanto argues that for a certified limit to exist, it has to be on the confidential statement of formula. And they predicate this argument entirely on 158.350E and the kind of example statement that's provided there. And I'd just like to point the court to a portion of that statement because it says in relevant part, no ingredient will be present in the product in an amount greater than the upper certified limit or in an amount less than the lower certified limit, if required, specified in the ingredient in a currently approved confidential statement of formula, and then in parentheses it says, or as calculated by the agency. And so the regulation that Monsanto hangs its case on explicitly carves out the idea that there are certified limits that are not in the confidential statement of formula and they are calculated by the agency. Then Monsanto focused significantly on the safety hazard. Apart from all of the global regulators, I'd like to point the court to a couple of our core allegations. First, we allege that a Monsanto employee, Martin Lessart, in an internal e-mail, described NNG as having known carcinogenic properties. That obviously lends some support to the plausibility. But then this is not just guilt, or I should really say plausibility by association. We had a toxicologist with 40 years experience and a PhD look at these facts, look at the two animal studies that Monsanto conducted. The first one, too many of the mice died that were exposed to NNG. And in the second one, it revealed a statistically significant increase for lymphomas in the mice. And that's not where the expert stopped. He also looked at the fact that this was structurally similar to a known carcinogen in nitrososarcosine. Monsanto makes much of the fact that the expert declaration was stricken, but the allegations were not pertaining to that. Allegations in the complaint were not. Right, pertaining to that. Right. And that's consistent with this court's holding in Oman v. NVIDIA, that it is a fact that Dr. Jameson is a toxicologist. It's a fact that he looked at this, and it's a fact that he concluded that the one part per million level poses a substantial safety hazard. And then lastly, as far as the products in the real world, I would point the court to the paragraph 269 and forward in our complaint. Those are the allegations pertaining to the sworn testimony of Dr. Stephen Ratten, a Ph.D. chemist and registration manager for Monsanto, who testified that they intentionally avoided testing real world products because they were worried they were going to find an exceedance of the one part per million limit and would have to recall those products. And I see that I'm out of time. Thank you, Your Honor. You are. But we want to thank all of you for your advocacy. It was very helpful. It's an important case, and we'll take our time with it. We'll take that under advisement, please, and go on to the next case.
judges: TALLMAN, CLIFTON, CHRISTEN